**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 51655**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: June 18, 2026** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) |
| MONTREZ LUSHON MAYBERRY, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Mark T. Monson, District Judge.

Judgment of conviction, <u>affirmed in part</u>, <u>vacated in part</u>, and <u>case remanded</u>; order denying Idaho Criminal Rule 35 motion, <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender; Kiley A. Heffner, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Raúl R. Labrador, Attorney General; Kale D. Gans, Deputy Attorney General, Boise, for respondent.

---

HUSKEY, Judge

Montrez Lushon Mayberry appeals from his judgment of conviction for first degree stalking and domestic battery with traumatic injury. Mayberry argues there was insufficient evidence that he engaged in a "course of conduct" to support his stalking conviction because he did not commit repeated acts of "nonconsensual contact" as defined in Idaho Code § 18-7906(2)(c). Mayberry also argues the district court abused its discretion pursuant to Idaho Rule of Evidence 403 when it allowed the State to present testimony about the existence of a no-contact order to prove the stalking charge, and the error was not harmless. Lastly, Mayberry argues the district court abused its discretion when it denied his Idaho Criminal Rule 35 motion to reduce his sentence for domestic battery with traumatic injury. We hold that "contact," within the meaning of I.C. § 18-7906(2)(c), is not the type of physical contact relied upon in this case as the basis of the first degree stalking charge. Consequently, the State failed to sustain its burden of proving

1

Mayberry engaged in a course of nonconsensual contact pursuant to I.C. § 18-7906(2)(c) to satisfy the elements of first degree stalking beyond a reasonable doubt. As a result, the finding that Mayberry is guilty of first degree stalking is reversed, his judgment of conviction for first degree stalking is vacated, and we remand the case for further proceedings consistent with this opinion. Because we vacated his judgment of conviction for first degree stalking, it is not necessary to address Mayberry's arguments in regard to the admission of evidence of the no-contact order. However, we affirm the district court's order denying Mayberry's I.C.R. 35 motion.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Mayberry was charged with first degree stalking, I.C. § 18-7905(1)(a), and two counts of domestic battery with traumatic injury, I.C. §§ 18-918(2)(a), -903(a). In relation to the first degree stalking charge, the State alleged Mayberry repeatedly contacted or attempted to contact the victim, M.F., between March 1, 2023, and June 13, 2023, during which time there was a no-contact order in place, and such contact seriously alarmed, annoyed, or harassed M.F. and caused M.F. substantial emotional distress. The underlying conduct alleged was that Mayberry punched, hit, and bit M.F. Mayberry pleaded not guilty, and the case proceeded to trial.

At trial, the evidence showed that, despite there being a no-contact order between Mayberry and M.F., they were in a dating relationship and M.F. invited Mayberry to live with her. Mayberry moved into M.F.'s residence in January or February 2023. On June 13, 2023, M.F. drove her car to a local fast-food restaurant with Mayberry. While M.F. ordered their food, Mayberry grew frustrated with M.F. because he thought she was ordering the wrong items. After receiving their food, M.F. and Mayberry drove back to their residence. An argument ensued, culminating in Mayberry throwing the food toward M.F., hitting the bedroom wall with it. Mayberry and M.F. continued to argue and Mayberry told M.F. he wanted to go to Spokane, Washington and wanted M.F. to drive him; M.F. indicated she did not want to drive Mayberry to Spokane. Mayberry then slapped M.F. and punched her in the face with a closed fist, which M.F. blocked with the back of her hand. The punch caused swelling and bruising to M.F.'s finger and she felt a lot of pain in her hand. M.F. asked if one of her friends could ride to Spokane with them so that she did not have to drive back alone; Mayberry denied the request. M.F. maintained that she did not want to drive Mayberry to Spokane but did so anyway; the argument continued during the drive.

2

On the way to Spokane, M.F. drove with one hand because it was too painful to use the hand that blocked Mayberry's punch. Mayberry grabbed the steering wheel, causing the car to swerve to the right; when M.F. grabbed the steering wheel back, the car swerved to the left. Mayberry yelled at M.F. and hit her in the eye. Mayberry then told M.F. to pull over and get out of the car. Mayberry got out of the passenger seat, walked around the car, and grabbed M.F., pulling her out of the driver's seat. Mayberry continued the drive to Spokane with M.F. in the front passenger seat but soon thereafter, stopped at a park where they remained for a couple hours. During this time, M.F. turned on the location tracker application on her phone informing a friend of her location.

Mayberry and M.F. eventually returned to their residence. M.F.'s father arrived and informed her that law enforcement officers were on their way to the residence. After officers arrived, they entered the residence and placed Mayberry under arrest. An officer then transported M.F. to the hospital where she was treated for a broken finger, caused by Mayberry's punch. While waiting at the hospital, M.F. told the officer about another incident that occurred in March 2023 when Mayberry and M.F. were in an argument and Mayberry repeatedly drove 90 miles per hour and then slammed on the brakes. When Mayberry stopped at a gas station, M.F. attempted to grab the keys from the ignition and Mayberry attempted to grab them back. M.F. stated that during the struggle over the keys, Mayberry bit M.F.'s ear causing it to bleed. M.F. then ran and hid behind a dumpster.

During his testimony at trial, Mayberry confirmed he and M.F. were in a dating relationship and lived together, despite the active no-contact order. However, Mayberry disputed the alleged conduct on June 13, 2023. Mayberry testified M.F. told him to "shut up" when he gave her his order at the fast-food restaurant. Mayberry agreed he threw the food but clarified he did not throw it at M.F. He testified M.F. injured her own finger and he did not punch her at their residence or in M.F.'s car. Mayberry testified he wanted to get away from M.F. and during the drive to Spokane, he grabbed the steering wheel because M.F. was not paying attention to the road and had swerved into another lane. He testified that when M.F. pulled the car over, he did not pull her out of the car. Mayberry also refuted the alleged conduct in March 2023. Mayberry testified he did not recall the events that happened in March 2023, but he did not think he and M.F. were fighting over the car keys. Mayberry further testified he did not bite M.F.'s ear.

3

During closing arguments, the State argued the events that occurred in March 2023 and on June 13, 2023, constituted stalking. The State asserted Mayberry committed stalking when he maliciously bit M.F.'s ear, threw the food at her, punched her hand at their residence, punched her while she was driving, took the steering wheel away from her, and pulled her out of the driver's seat--all against M.F.'s consent in violation of the no-contact order. Mayberry argued he did not commit stalking because he and M.F. were consensually living together at the time. In response, the State argued it was irrelevant that Mayberry and M.F. were living together at the time of the alleged offenses. The State maintained that Mayberry committed stalking because he had repeated nonconsensual contact with M.F. and the contact seriously alarmed, annoyed, and harassed her. Specifically, the State argued Mayberry committed stalking by engaging in nonconsensual physical contact--punching, hitting, and biting--against M.F. between March 2023 and June 13, 2023.

The jury found Mayberry guilty of stalking and domestic battery with traumatic injury for the conduct alleged on June 13, 2023, and not guilty of domestic battery with traumatic injury for the conduct alleged in March 2023. In the bifurcated portion of the trial, the jury further found Mayberry's actions that constituted stalking were in violation of a no-contact order. At sentencing, the district court imposed a determinate sentence of ten years for domestic battery with traumatic injury and an indeterminate sentence of five years for stalking. The district court ordered the sentences to run consecutively to each other. Mayberry filed an I.C.R. 35 motion to reduce his sentence; the motion was denied. Mayberry appeals.

## II.

## STANDARD OF REVIEW

Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the

4

prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

This Court exercises free review over the application and construction of statutes. *State v. Reyes*, 139 Idaho 502, 505, 80 P.3d 1103, 1106 (Ct. App. 2003).

A motion for reduction of sentence under I.C.R. 35 is essentially a plea for leniency, addressed to the sound discretion of the trial court. *State v. Knighton*, 143 Idaho 318, 319, 144 P.3d 23, 24 (2006); *State v. Allbee*, 115 Idaho 845, 846, 771 P.2d 66, 67 (Ct. App. 1989). In presenting an I.C.R. 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the trial court in support of the motion. *State v. Huffman*, 144 Idaho 201, 203, 159 P.3d 838, 840 (2007).

### III.

### ANALYSIS

Mayberry argues there was insufficient evidence for the jury to conclude beyond a reasonable doubt that he engaged in a "course of conduct," as defined under I.C. § 18-7906(2)(a), to sustain a first degree stalking conviction. Mayberry argues "contact," within the meaning of I.C. § 18-7906(2)(c)(i)-(vii), criminalizes repeated, intrusive acts involving unwanted communication, presence, or surveillance over time, not repeated assault, battery, or other acts of violence. Mayberry also argues the district court abused its discretion pursuant to I.R.E. 403 when it allowed the State to present testimony regarding the existence of the no-contact order between Mayberry and M.F. to prove the stalking charge. Mayberry argues this error was not harmless. Lastly, Mayberry argues the district court abused its discretion when it denied his I.C.R. 35 motion. The State argues it presented sufficient evidence that Mayberry engaged in a "course of conduct," within the meaning of I.C. § 18-7906(2)(a), to satisfy a first degree stalking conviction because M.F. did not consent to the physical contact that occurred between March and June 2023, and such contact caused her substantial emotional distress. The State also argues the district court did not err in admitting evidence of the no-contact order. Finally, the State argues the district court did not abuse its discretion when it denied Mayberry's I.C.R. 35 motion.

### A. Sufficiency of the Evidence--First Degree Stalking

Mayberry argues there was insufficient evidence for the jury to conclude beyond a reasonable doubt that he engaged in a "course of conduct" pursuant to I.C. § 18-7906(2)(a), sufficient for a first degree stalking conviction. Mayberry argues he did not engage in the type of

5

nonconsensual contact enumerated in I.C. § 18-7906(2)(c), and even if the list of acts is not exhaustive, the physical contact alleged in his case is not the type of contact the statute seeks to protect against. More specifically, Mayberry argues nonconsensual contact for purposes of stalking is the unwanted intrusive communicative act, presence, or surveillance by the defendant directed toward the victim, not unwanted physical acts as contended by the State. The State agrees that Mayberry did not engage in any of the nonconsensual acts enumerated in I.C. § 18-7906(2)(c), but the list of acts is non-exhaustive and "nonconsensual contact" includes all contact, not only communicative or expressive contact.

Statutory interpretation begins with the statute's plain language. *State v. Dunlap*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013). Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. *State v. Burnight*, 132 Idaho 654, 659, 978 P.2d 214, 219 (1999); *State v. Escobar*, 134 Idaho 387, 389, 3 P.3d 65, 67 (Ct. App. 2000). The language of the statute is to be given its plain, obvious, and rational meaning. *Burnight*, 132 Idaho at 659, 978 P.2d at 219. If the language is clear and unambiguous, the legislature's clearly expressed intent must be given effect, and there is no occasion for the court to resort to legislative history or rules of statutory interpretation. *Dunlap*, 155 Idaho at 361-62, 313 P.3d at 17-18; *Escobar*, 134 Idaho at 389, 3 P.3d at 67.

"A statute is not ambiguous merely because the parties present differing interpretations. Instead, the statute is ambiguous only if more than one of the interpretations can be reasonably construed from the language of the statute." *BHC Intermountain Hosp., Inc. v. Ada Cnty.*, 150 Idaho 93, 96, 244 P.3d 237, 240 (2010). This Court "examine[s] the literal words of the statute to determine whether they support the parties' differing interpretations." *Id.* When this Court must engage in statutory construction because an ambiguity exists, it has the duty to ascertain the legislative intent and give effect to that intent. *State v. Beard*, 135 Idaho 641, 646, 22 P.3d 116, 121 (Ct. App. 2001). To ascertain such intent, not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute, and its legislative history. *Id.* It is incumbent upon a court to give an ambiguous statute an interpretation which will not render it a nullity. *Id.* Constructions of an ambiguous statute that would lead to an absurd result are disfavored. *State v. Doe*, 140 Idaho 271, 275, 92 P.3d 521, 525 (2004).

The State charged Mayberry with first degree stalking pursuant to I.C. § 18-7905(1)(a), alleging he engaged in a course of conduct that seriously alarmed, annoyed, or harassed M.F. by

6

attempting to contact or repeatedly contacting M.F. while there was a no-contact order in place prohibiting such contact. Pursuant to I.C. § 18-7905(1)(a), as relevant here, a person commits first degree stalking by committing second degree stalking, I.C. § 18-7906, and "the actions constituting [stalking] are in violation of a . . . no[-] contact order." A person commits second degree stalking by knowingly and maliciously "[e]ngag[ing] in a course of conduct that seriously alarms, annoys or harasses the victim and is such as would cause a reasonable person substantial emotional distress." I.C. § 18-7906(1)(a). The statute defines "course of conduct" as "repeated acts of nonconsensual contact involving the victim." I.C. § 18-7906(2)(a). Finally, for purposes of this appeal, I.C. § 18-7906(2)(c)(i)-(vii) defines "nonconsensual contact" and provides a list of enumerated examples:

> (c) "Nonconsensual contact" means any contact with the victim that is initiated or continued without the victim's consent, that is beyond the scope of the consent provided by the victim, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued. "Nonconsensual contact" includes, but is not limited to:
> (i) Following the victim or maintaining surveillance, including by electronic means, on the victim;
> (ii) Contacting the victim in a public place or on private property;
> (iii) Appearing at the workplace or residence of the victim;
> (iv) Entering onto or remaining on property owned, leased or occupied by the victim;
> (v) Contacting the victim by telephone or causing the victim's telephone to ring repeatedly or continuously regardless of whether a conversation ensues;
> (vi) Sending mail or electronic communications to the victim; or
> (vii) Placing an object on, or delivering an object to, property owned, leased or occupied by the victim.

The Idaho Supreme Court has interpreted I.C. § 18-7906 in *State v. Eliasen*, 158 Idaho 542, 348 P.3d 157 (2015) and *State v. Smith*, 175 Idaho 635, 569 P.3d 137 (2025). The issue in *Eliasen* was whether conduct within one continuous incident constituted repeated acts necessary to establish a course of conduct. There, the State charged Eliasen with second degree stalking for appearing at the victim's residence, following the victim to a store, conducting surveillance on the victim while the victim carried out their business at the store, and following the victim from the store until the victim pulled into a police station. *Eliasen*, 158 Idaho at 547, 348 P.3d at 162. On appeal, Eliasen argued there was insufficient evidence for the jury to convict her of stalking because she did not engage in "repeated acts" of nonconsensual contact per I.C. § 18-7906, but rather, she only engaged in a single occurrence of nonconsensual contact. *Eliasen*, 158 Idaho at

7

547, 348 P.3d at 162. The Court held it is not necessary for the actions to be temporally separated by a break in time to be considered repeated acts and concluded, based on the plain language of the statute and the non-exclusive list in I.C. § 18-7906(2)(c)(i)-(vii), Eliasen engaged in at least two acts identified by the statute. *Eliasen*, 158 Idaho at 547, 348 P.3d at 162. Thus, the Court held there was "substantial evidence for a jury to conclude that Eliasen engaged in repeated acts constituting a course of conduct under I.C. § 18-7906." *Eliasen*, 158 Idaho at 547, 348 P.3d at 162.

The issue in *Smith* was whether a single allegation of nonconsensual contact created a course of conduct pursuant to I.C. § 18-7906(2)(a) and whether the evidence presented demonstrated that Smith's conduct seriously alarmed, annoyed, or harassed the victim. *Smith*, 175 Idaho at 642, 569 P.3d at 144. There, Smith followed the victim's vehicle from work, repeatedly appeared near the victim's residence, and took photographs of road signs near the victim's residence--all of which caused the victim significant concern resulting in the victim installing security cameras and parking in secure locations. *Id.* The Court held Smith's actions occurred over several weeks; clearly constituted a course of conduct consisting of repeated acts of nonconsensual contact; and based on the victim's response, caused the victim substantial emotional distress. *Id.* at 644, 569 P.3d at 146. The Court held that "a reasonable, prudent person would believe Smith knowingly and maliciously engaged in a course of conduct by following the victim and appearing at her residence, which seriously alarmed, annoyed, or harassed her and would cause a reasonable person substantial emotional distress" in accordance with I.C. § 18-7906. *Id.* at 644, 569 P.3d at 146.

In both *Eliasen* and *Smith*, the acts of nonconsensual contact fell squarely within the list of enumerated examples provided in I.C. § 18-7906(2)(c). That is not the case here. Instead, we are asked to decide whether physical contact is prohibited contact pursuant to I.C. § 18-7906(2).

Mayberry and the State provide different definitions of the term "contact" in the statute. Mayberry argues nonconsensual contact, for purposes of I.C. § 18-7906(2)(c), is any contact that includes repeated and intrusive unwanted communication, presence, or surveillance over time, not physical contact such as repeated battery. The State argues nonconsensual contact, as explicitly stated in I.C. § 18-7906(2)(c), is "any contact," including contact that involves unwanted physical touching.

8

The term "contact" must be given its plain, obvious, and rational meaning. *See Burnight*, 132 Idaho at 659, 978 P.2d at 219. But here, the statute has two, plain, obvious, and rational meanings. For example, Merriam-Webster's dictionary includes multiple definitions for the term "contact." There, "contact" is defined as a "union or junction of surfaces" and "the apparent touching or mutual tangency of the limbs of two celestial bodies" or "establishing of communication with someone or an observing or receiving of a significant signal from a person or object." *Contact*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/contact (last visited Apr. 22, 2026). Similarly, Cambridge dictionary defines contact as "communication with someone, especially by speaking or writing to them regularly" or "the fact of two people or things touching each other." *Contact*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/contact (last visited Apr. 22, 2026). The plain, obvious, and rational meaning of the term "contact" supports both parties' interpretations because "contact" within I.C. § 18-7906(2)(c) could mean to communicate, physically touch another person, or both. More than one interpretation of I.C. § 18-7906(2)(c) can reasonably be construed from the term "contact," which makes the statute ambiguous.

Idaho Code § 18-7906(2)(c) uses the term "nonconsensual contact" and then provides an enumerated, non-exhaustive list of what nonconsensual contact includes. Those examples are attempted or completed communication, I.C. § 18-7906(2)(c)(ii), (v)-(vi), continued presence, I.C. § 18-7906(2)(c)(iii)-(iv), or surveillance of another person, I.C. § 18-7906(2)(c)(i), (vii). *Smith*, 175 Idaho at 643-44, 569 P.3d at 145-46; *Eliasen*, 158 Idaho at 547, 348 P.3d at 162. Missing from this list is any example of physical contact by means of touching another person, which suggests the Idaho Legislature did not intend to include physical touching despite the use of the term "any contact." Therefore, to determine what type of contact the legislature intended to prohibit, we must examine the literal words of the statute, the context of those words, the public policy behind the statute, and its legislative history. *See Beard*, 135 Idaho at 646, 22 P.3d at 121.

The public policy and legislative history of the stalking statute supports Mayberry's interpretation. The Idaho Legislature first passed a criminal stalking statute in 1992. The legislative history of the original stalking statute indicated it was added to the malicious harassment statute, which did prohibit physical touching, but did not contemplate physical contact when it codified the commonly understood usage of the term stalking. The representative from the Ada County Prosecutor's Office noted that their office typically prosecuted this type of conduct

9

under I.C. § 18-6701, which prohibited the use of the telephone to harass and annoy, but many harassment cases did not involve the telephone, thus, "something more" was needed. *Harassment: Stalking is a Crime: Hearing on S.B. 1333 Before the S. Judiciary and Rules Comm.*, 51st Leg., 2nd Reg. Sess. (Idaho 1992) [hereinafter *Harassment: Stalking is a Crime*] (statement of Joe Filicetti, Deputy Ada County Prosecutor). Another person described being stalked for seven years by a person who followed her from Idaho to a different state, then back to Idaho, even following her to her workplace. At the time there was no statute that criminalized that behavior. *Harassment: Stalking is a Crime* (statement of K.S.). Other individuals who spoke in favor of its passage feared their stalkers because those individuals followed the victims to and from their homes, work, and daily errands; showed up at their homes unannounced and uninvited; sat outside the victims' homes and watched their house; and made repeated threatening phone calls to them or their immediate family members. *Harassment: Stalking is a Crime* (statements of S.C. and K.S., and written statement of an anonymous supporter read by Sen. Allan F. Larsen). Many of the alleged stalkers were known to the victims, and the victims received threats, causing them to live in substantial fear of the person who followed them. *See id.* While some of the victims noted that prior physical abuse heightened their fear of their stalkers, none of the victims testified the stalking bill was necessary to address unwanted physical contact. *See id.*

The statement of purpose for the 1992 stalking statute reads: "This legislation provides for the crime of stalking, wil[l]fully, maliciously or harassment of another person with the intent to place that person in reasonable fear of death or great bodily injury." S.B. 1333, 51st Leg., 2nd Reg. Sess. (Idaho 1992) (Statement of Purpose RS00975). The purpose of the statute was not to address physical contact but to criminalize certain conduct that was not otherwise proscribed by law, as evidenced by various comments in the minutes from the victims about law enforcement's inability to stop such behavior. Thus, the purpose of the original stalking statute was not to address physical contact that already constituted a criminal act. Rather, its purpose was to criminalize other conduct that places a person in reasonable fear of subsequent nonconsensual physical contact that would result in death or great bodily injury. *Id.*

The 1992 stalking statute was repealed and amended in 2004, which is virtually identical to its current version.[1] *Compare* I.C. §§ 18-7905, -7906 *with* I.C. §§ 18-7905, -7906 (2004). In

---

[1] Idaho Code § 18-7905(1)(f)(viii) was updated in 2022 to account for an edit in the referred to code section.

2004, proponents of the amendment voiced their concern about perpetrators violating no-contact orders, harassing victims, and making threats that victims reasonably believed could be fulfilled. *Stalking/penalty: Hearing on H.B. 668 Before the H. Judiciary, Rules and Admin. Comm.*, 57th Leg, 2nd Reg. Sess. (Idaho 2004) [hereinafter *Stalking/penalty*] (statement of K.P.); *Relating to the crime of Stalking: Hearing on H.B. 668 Before the S. Judiciary and Rules Comm.*, 57th Leg, 2nd Reg. Sess. (Idaho 2004) (statement of K.P.). Additional information was presented showing that perpetrators could use Global Positioning Systems (GPS) to survey or locate the individuals they sought to harass or follow. *Relating to the crime of Stalking: Hearing on H.B. 668 Before the S. Judiciary and Rules Comm.*, 57th Leg., 2nd Reg. Sess. (Idaho 2004) [hereinafter *Relating to the crime of Stalking*] (statement of Heather Reilly, Attorney, Idaho Prosecuting Attorneys Association). Proponents of amending the stalking statute believed the original statute did not provide a sufficient penalty for those who engaged in the above-described behavior. *Relating to the crime of Stalking* (statement of Sen. Denton Darrington, Chairman, S. Judiciary and Rules Comm.). This led to amending the stalking statute in 2004 to distinguish first and second degree stalking as a felony and misdemeanor, respectively, by creating separate code sections. H.B. 668, 57th Leg., 2nd Reg. Sess. (Idaho 2004) (Statement of Purpose RS 14049); *see also Relating to the crime of Stalking* (statements by Rep. Debbie Field, Chairman, H. Judiciary, Rules and Admin. Comm.). In doing so, the legislature created aggravating factors that would elevate a second degree stalking to a first degree stalking, one of which was the presence of a no-contact order. H.B. 668.

In support of the amendment, the representative for the Idaho Prosecuting Attorneys Association informed the committee that the legal definition for stalking varies by jurisdiction, but stalking generally referred to a broad range of conduct directed at the victim that includes the ability to harass, frighten, threaten, or force themselves into the life and consciousness of the victim. *Relating to the crime of Stalking* (statement of Heather Reilly, Attorney, Idaho Prosecuting Attorneys Association). This common understanding of stalking was consistent with statements by the proponents of the amendment describing their concerns about perpetrators violating no-contact orders, harassing and making reasonable threats to victims, and the ease of observing, monitoring, or surveilling someone through the use of the internet. *See Stalking/penalty* (statements by K.P.); *Relating to the crime of Stalking* (statement of K.P.; Rep. Field, Chairman, H. Judiciary, Rules and Admin. Comm.; and Heather Reilly, Attorney, Idaho Prosecuting

11

Attorneys Association).  None of the committee minutes include references to physical contact. *See Stalking/penalty* (statement of K.P.); *Relating to the crime of Stalking* (statement of K.P., Rep. Debbie Field, Chairman, H. Judiciary, Rules and Admin. Comm.; and Heather Reilly, Attorney, Idaho Prosecuting Attorneys Association).  Rather, stalking was generally understood as a form of communication that placed someone in reasonable substantial fear of subsequent physical contact by means of repeated threats, presence, or surveillance.  *See Stalking/penalty* (statement of K.P.); *Relating to the crime of Stalking* (statement of K.P.; Rep. Debbie Field, Chairman, H. Judiciary, Rules and Admin. Comm.; and Heather Reilly, Attorney, Idaho Prosecuting Attorneys Association).

The amendment also defined nonconsensual contact, none of which described physical contact that was already criminalized by other statutes.  We recognize the examples of contact described in the stalking statute are preceded by the phrase, "includes, but is not limited to." Nonetheless, nothing in the language of the statute indicates the legislature intended to include physical contact that could be prosecuted under other statutes.  While the legislature could have chosen to include physical contact as one of the enumerated types of prohibited contact, it did not do so.  H.B. 573, 57th Leg., 2nd Reg. Sess. (Idaho 2004) (Statement of Purpose RS 13730); *Stalking/penalty*.  Thus, the 2004 amendment did not contemplate that nonconsensual contact would include physically touching another person, nor did it deviate from its original purpose of criminalizing communicative conduct that was not addressed in other statutes.  *Compare* S.B. 1333, *with* H.B. 668.

In light of the above legislative history, we hold that for purposes of I.C. § 18-7906(2)(c), nonconsensual contact includes "any contact" such as attempted or completed communication, continued presence, or surveillance of another person.  However, according to the context and common meaning of the word "contact," the rules of statutory construction, the public policy behind the statute, and its legislative history, the term "contact" does not include physical contact that is already criminalized by different statutes.  The nonconsensual contact, such as unwanted communication, presence, or surveillance, must have been initiated or continued without the victim's consent, been done beyond the scope of the provided consent, or been done in disregard of the victim's expressed consent for the contact to be avoided or discontinued.

Considering the evidence in the light most favorable to the prosecution, there is no evidence upon which a reasonable trier of fact could have found the State sustained its burden of proving

12

Mayberry engaged in unwanted communication, presence, or surveillance as contemplated by I.C. § 18-7906(2)(c). While in a dating relationship, M.F. invited Mayberry to live with her in her residence. Thus, the testimony shows M.F., not Mayberry, initiated the contact, consented to communication with Mayberry, and engaged in a consensual romantic relationship. The record does not show M.F. provided limitations to communicative contact or that Mayberry exceeded the scope of M.F.'s consent to such contact while the two shared the same residence over several months. Mayberry continued to live with M.F. until his arrest months after these events occurred, and there was no evidence presented showing M.F. sought to avoid or discontinue such contact or request that Mayberry move out of the shared residence.

While the evidence presented at trial shows a pattern of aggressive and violent behavior committed by Mayberry toward M.F., which caused her to panic and suffer from fear, no evidence presented, or argument made, shows Mayberry engaged in nonconsensual contact similar to that defined by the statute without M.F.'s consent.

The State argues the physical abuse committed by Mayberry seriously alarmed, annoyed, or harassed M.F. and caused her substantial emotional distress sufficient for stalking. We do not disagree that a domestic abuse victim could suffer from physical and emotional harm caused by repeated physical abuse. And while M.F. did not consent to the physical abuse inflicted upon her, that nonconsensual physical contact is covered by other statutes and the State could have charged Mayberry with violations of the relevant criminal statutes for that conduct. But for the purpose of I.C. § 18-7906(2)(c), the factual basis alleged for this crime--punching, hitting, and biting--is not the type of contact prohibited by I.C. § 18-7906(2)(c).

Consequently, the evidence presented at trial was insufficient to show Mayberry engaged in nonconsensual contact as contemplated by I.C. § 18-7906(2)(c). As such, there lacks substantial evidence upon which a reasonable trier of fact could have found the State sustained its burden of proving the essential elements of stalking beyond a reasonable doubt. Therefore, Mayberry's conviction for first degree stalking is vacated.

Because we are vacating Mayberry's first degree stalking conviction, we need not address whether the jury could consider the alleged acts that occurred in March 2023 as part of the stalking course of conduct. We also need not consider whether the district court erroneously admitted evidence of the no-contact order since that evidence was admitted solely to prove the stalking charge.

13

**C.     Idaho Criminal Rule 35**

Mayberry argues the district court abused its discretion when it denied his I.C.R. 35 motion after he "provided new or additional information to support a reduction of the fixed portion of his sentence for domestic battery." The State argues "the district court properly denied Mayberry's [I.C.R.] 35 motion for a reduction of sentence" and Mayberry failed to present new information to support his motion.

In presenting an I.C.R. 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the motion. *Huffman*, 144 Idaho at 203, 159 P.3d at 840. Upon review of the record, including any new information submitted with Mayberry's I.C.R. 35 motion, we conclude no abuse of discretion has been shown. Therefore, the district court's order denying Mayberry's I.C.R. 35 motion is affirmed.

## IV.

## CONCLUSION

There lacks substantial evidence upon which a reasonable trier of fact could have found the State sustained its burden of proving Mayberry committed first degree stalking pursuant to I.C. §§ 18-7905 and 18-7906 because there was no evidence presented that Mayberry engaged in the type of expressive, communicative contact prohibited by the statute. Therefore, the jury finding Mayberry guilty of first degree stalking is reversed, his judgment of conviction for first degree stalking is vacated, and we remand the case for further proceedings consistent with this opinion. Because we vacated Mayberry's first degree stalking conviction, we need not address Mayberry's I.R.E. 403 argument regarding the existence of a no-contact order between Mayberry and M.F. to prove the stalking charge. The district court's order denying Mayberry's I.C.R. 35 motion to reduce his sentence for domestic battery with traumatic injury is affirmed.

Chief Judge TRIBE and Judge LORELLO **CONCUR**.

14